UNITED STATES OF AMERICA
DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT

2009 JUN 25  P 2: 01

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **SEALED DOCUMENT** |
| ) | |
| V.                                              ) | No. 09-Cr-30-02-GZS |
| ) | |
| ELAINE BROWN                         ) | |

## EX-PARTE OFFER OF PROOF

Pursuant to the Court's order of June 23, 2009, counsel for defendant Elaine Brown submits the following summary of the evidence and legal authority in support of a jury instruction on a defense of justification.

### A. Offer of Proof

On January 18, 2007 Elaine Brown was released to the custody of her son in Worcester, Massachusetts after a jury convicted her and her husband Edward of tax-related offenses. Prior to the verdicts he stopped attending their trial and returned to the marital home in Plainfield, New Hampshire, where he remained until he and Elaine were arrested there on October 4, 2007. If she chooses to take the stand in her own defense, Elaine would be expected to testify that the separation from her husband caused her extreme stress and panic attacks, which she had not before experienced, and that she recognized separation of husband and wife as against biblical teaching.

Edward and Elaine spoke regularly on the telephone while she was staying with her son. If called as witnesses, her son and daughter are expected to testify that during that time she was very emotional. After the telephone conversations with Edward, her son describes her as "being

a mess." She was sometimes shaking, crying, and uncharacteristically unsure of herself. Elaine told her son that Edward accused her of being a coward for not being with him in Plainfield and of betraying him. The telephone conversations with Edward were often lengthy. Her loss of composure was evidenced by Elaine's tear-smeared make-up.

On February 20, 2007, when her son was away on business, Elaine arranged to return to Plainfield, where she removed the electronic monitoring bracelet which had been placed on her ankle by a probation officer. She was not armed and to the best of her knowledge there were no firearms at the marital home when she arrived there. Some weeks after Elaine returned home Joseph Janeczwewski arrived there. He had been diagnosed with cancer. A bed was set up on the first floor. His wife and Elaine, who is a certified herbalist, cared for him for several days before he had to be returned to Mount Ascutney Hospital in Windsor, Vermont. He died shortly thereafter. While at the Brown home, he gave a pistol to Edward as a present. As far as Elaine knew, that was the only firearm in the Brown home between February 20 and June 7, 2007. There is evidence in pre-trial discovery that Brown supporters brought firearms or at least arranged for firearms to be brought to the home before June 7, but Elaine did not know about any such firearms until after June 7.

As the Court knows from the trial in United States v. Riley, D.N.H. 07 Cr. 189-01/03-GZS [Hereinafter "*Riley Tr.*–"] over which it presided, around 8:30 AM on June 7, 2007 at the end of the long Brown driveway Daniel Riley and the Brown's dog Zoe encountered armed government agents in full military regalia, including camouflage fatigues. Riley asked if they were hunting turkeys. USM Joe Buchanan and USM Jeff Mertes were among the members of that Special Operations Group who suddenly revealed themselves to Riley. According to their

reports, they ordered him to get down. Instead he turned, began to run back toward the house, yelling something. According to his Use of Force Report, Mertes shot "one KO1 less lethal round at the subjects[sic] legs while he was running" but missed. It appears that the weapon used was a 37 MM Sage Launcher, which looks like a lethal weapon, but as used by Mertes was not. Later that day Riley told the Browns and others that he had been shot at several times and that he heard bullets going past his head, which led Elaine to believe that the agents had actually used lethal force against one of the Browns' supporters.

According to Buchanan's report, when the first round or rounds missed Riley, Buchanan tazered him. The defense anticipates that it will be able to elicit testimony from Buchanan or other government witnesses that a tazer is an electro-shock weapon which uses electrical current to disrupt voluntary control of muscles. The subject experiences pain as well as loss of muscle control. Serious injury and some deaths have been related to tazer use. Although Riley suffered no permanent bodily injury, it is unlikely that the agents will credibly deny that Riley was subjected to immobilization and pain.

After being tazered Riley was taken into custody, interrogated by federal agents, and then released. He then returned to the Browns and described in excited terms what he had undergone.

Elaine was at the house when she saw Zoe dash back up the driveway without Riley. She worried about his whereabouts. Later that morning a neighbor telephoned to say that numerous law enforcement vehicles were coming south on NH Route 12 A toward the Brown residence, including armored vehicles. Later that day local television newscasts depicted two armored personnel vehicles (APC) as part of that convoy. If permitted by the Court, the defense will offer one or more clips from those newscasts.

As part of discovery, the government has provided the defense with a list of the personnel and equipment it had near the Brown residence and Elaine's dental office in West Lebanon on June 6 and 7, 2007. Some 170 members from fourteen federal, state and local agencies were involved, including law enforcement and the national guard. In addition to the APCs there were fire trucks, ambulances, a medivac helicopter, and two surveillance aircraft.

Elaine will testify that June 7 was the first time that she became afraid for her life. She saw herself, Edward and their home as subject to the same lethal government force as the civilian victims of the 1992 shooting of Randy Weaver's wife and son at Ruby Ridge, Idaho and of the 1993 government assault on the Branch Davidian complex in Waco, Texas. If permitted by the Court, the defense will offer evidence that video-tapes about both of those episodes were found in the Brown home after their arrest, and testimony that Randy Weaver came to Plainfield and met with the Browns and their supporters a few weeks after June 7.

To protect herself from what she reasonably perceived as a real threat of unlawful government force, after June 7 Elaine obtained from a supporter the black Glock pistol which the agents recovered from her after her arrest on October 4, 2007. Her defense is that her possession of that Glock was justified by the reasonably perceived threat that the government was prepared to use deadly force against her when she had not been convicted of a violent felony and when she posed no imminent threat to law enforcement or anyone else. In their public statements on and after June 7 the Browns said that they would never initiate force against anyone but that they would not submit to arrest on the outstanding warrants, since they had committed no crime, and that if force was used against them, they would defend themselves. Fortunately, as it turned out, nobody ever fired a weapon at them, and they never discharged a weapon at anybody.

It will be abundantly clear to the jury that by October 4, 2007 there was a considerable quantity of firearms, ammunition, and explosive devices at the Brown home. However, other than the Glock pistol Elaine obtained for herself, she was not involved in having those items brought onto the property. Cleaning the house, she was certainly aware that they were there, but she did not participate in getting, positioning, or using them. She did not have dominion and control over them. That Elaine was present in the marital home does not render her guilty of possessing any of the firearms other than the pistol. Assuming *arguendo* that she could be liable for possession of those items as a co-conspirator with Edward and others, the assembling of that defensive arsenal was a justifiable response to the government show of force on June 7, 2007 and thereafter, including continued ground surveillance, regular aerial surveillance (according to discovery, 18 separate flights from June 6 to October 2), checkpoints and roadblocks, and termination of regular electrical and telephone services.

It is respectfully requested that the Court reconsider its decision at the pretrial barring evidence that Elaine Brown reasonably <u>believed</u>, albeit it erroneously, that she did not have to pay a federal tax on the gain from her own labor, so that she was not lawfully convicted of tax evasion on January 18, 2007. In support of that, she would offer all or pertinent parts of a video which was recovered from the Brown home after their arrest and which she would testify that she and Edward watched and gave away to others, *America from Freedom to Fascism*, by Aaron Russo, the producer of the well-known films *Trading Places, Wise Guys,* and *The Rose*. Counsel recently watched it. It is professionally made and includes quotations from Supreme Court and lower federal court decisions and interviews of various thoughtful, well-spoken, and respected public officials, including former Secretary of the Treasury William Simon and former IRS

officials and agents. It makes a plausible argument that there is no statutory provision which imposes a federal income tax on the gain from an individual person's labor. There is ample case law that the federal income tax on the gain from an individual person's labor is indeed lawful, but that duty is not clearly and succinctly laid out in statutory language which can be shown to a lay person who like Elaine says,"Show me the law" that compels her to pay federal taxes on the gain from her labor. Elaine and Edward repeatedly stated in public that if someone would show them that law, they would pay their taxes.

### B. Legal Authority

United States v. Leahy, 473 F. 3d 401, 403 (1st Cir.2007), *cert. denied* 128 S. Ct. 374 (2007), holds, "[T]here is a justification defense available in felon-in-possession cases, which typically encompasses duress, necessity, and self-defense." It puts on the defendant the burden of persuasion to establish that defense. Leahy, 473 F.3d at 408-409. In Leahy this Court had instructed the jury that, notwithstanding that he was a felon, the defendant's possession of a firearm would be justified, thereby warranting an acquittal, if (i) Leahy was under an unlawful and present threat of death or serious bodily injury, (ii) he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct; (iii) he had no reasonable legal alternative but to engage in that conduct; and (iv) there was a direct causal relationship between his criminal conduct and the need to avoid the threatened harm. Leahy, 473 F.3d at 404.

Leahy does not address a felon's claim of self-defense with regard to law enforcement officers. Leahy, 473 F.3d at 403, n.1. There do not appear to be any First Circuit cases which do address such a claim. However, the Tenth Circuit Court of Appeals has extended the reasoning in Leahy to support a prisoner's defense of justification for an assault against a guard, if the

defendant can establish that he was under imminent fear of death or serious bodily harm, which in that case the prisoner failed to do. United States v. Jones, 254 Fed Appx. 711, 721 (10th Cir. 2007), which cites United States v. Bello, 194 F.3d 18 (1st Cir.1999). In Bello the First Circuit Court of Appeals considered whether a prisoner accused of assaulting another prisoner was entitled to jury instructions on self-defense and duress. The Court held that he was not, since he was not in immediate danger when he committed the assault in a prison recreational yard, since 18 hours had passed since the alleged threat in a dining hall and since the defendant had lawful alternatives, such as reporting the threat to the guards. Bello, 194 F.3d at 26-27. The Court reiterated, however, "[A] defendant is entitled to an instruction as to any recognized defense for which there exists sufficient evidence for a reasonable jury to find in his favor." Bello, 194 F.3d at 27 (quoting Matthews v. United States, 485 U. S. 58, 63, 108 S. Ct. 883 (1988).

Like the First Circuit Court of Appeals, the Third Circuit Court of Appeals places on the defendant the burden of proving the affirmative defense of justification by the preponderance of the evidence. United States v. Dodd, 225 F.3d 340, 342 (3d Cir.2000). The Third Circuit concludes that the defendant may rely on such a defense under the following circumstances:

1. He was under unlawful and present threat of death or serious bodily injury;

2. He did not recklessly place himself in a position where he would be forced to engage in criminal conduct;

3. He had no reasonable legal alternative to both the criminal act and the avoidance of the threatened harm;

4. There is a direct causal relationship between the criminal action and the avoidance of the threatened harm.

United States v. Alston, 526 F.3d 91, 95 (3rd Cir.2008). The Fourth Circuit Court of Appeals

found counsel to be ineffective in advising a felon appellant that he could not present a defense of justification to a jury. United States v. Mooney, 497 F.3d 397 (10th Cir.2007).

Application of the four part jury instruction which this Court gave in Leahy, and which the Third Circuit articulated in Alston, to the above offer of proof and to information contained in discovery and the trial transcripts of United States v. Riley demonstrates that Elaine Brown has sufficient colorable claims of self-defense, duress, and necessity to be allowed to address those defenses in her opening statement and to present supporting evidence.

In addition to the evidence proffered above, testimony from the Riley trial provides some supports for a defense of justification. Deputy marshal Kenneth Nunes testified that between February of 2007 and approximately June 7, 2007 the USM presence at or near the Brown residence "was extremely low key," involving random surveillance and "trying to build intelligence on the case." *Riley Tr. 85-86.* However, on June 6, 2007 about fifty deputies snuck onto or near the Brown property, hid, and waited for Edward Brown to come down his long driveway to get his mail, so that they could then arrest him. *Riley Tr. 88-89.* He did not appear. *Riley Tr. 89.* The same plan was put into effect in the pre-dawn hours of June 7. *Id.* It went awry. Instead of Edward, Daniel Riley came down the driveway with the Browns' dog. He was tazered, shot at, taken into custody, interrogated, and released. He then returned to the Brown residence and recounted what happened. After June 7 the presence of numerous armed deputy marshals and other law enforcement personnel around the Brown residence became quite apparent. *Riley Tr. 92-93.* The USM and the Browns ceased regular communication.

After the events of June 7, 2007 Elaine Brown had ample reason to believe that she was under a threat of death or serious bodily injury. The government will presumably seek to

minimize any such threat and contend that it was not unlawful. However, it is incontrovertible that as of June 7 neither of the Browns had been convicted of a crime of violence and neither had sought to leave their property. Under such circumstances law enforcement agents would not have been justified in using potentially deadly force to apprehend Elaine Brown.

Law enforcement use of deadly force must be objectively reasonable. Berube v. Conley, 506 F.3d 79, 82 (1st Cir.2007), citing Tennessee v. Garner, 471 U. S. 1, 7 105 S. Ct. 1694 (1985). Garner instructs,

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer, and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

Garner, 471 U. S. at 1701.

Whether law enforcement officers' use of force is excessive and thus unlawful depends on the facts and circumstances presented, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest, or attempting to evade arrest by flight." Parker v. Gerrish, 547 F.3d 1, 8-9 (1st Cir.2008) (quotations and citations omitted). Parker upheld a jury verdict against a South Portland, Maine police officer who tazered a motorist arrested for driving while intoxicated. There was even less justification for tazering Daniel Riley on June 7, 2007 than for tazering that motorist. There was utterly no justification for shooting at Riley. That conduct told Elaine Brown that the government was prepared to use unlawful, excessive force against her, even though the crimes then at issue involved tax evasion and structuring of financial transactions, even though she had remained on her property since returning in February, even though she was

9

not actively resisting arrest or attempting to evade arrest by flight, and even though she did not pose an immediate threat to the police or anyone else.

Elaine did not recklessly place herself in a situation where she would be forced to engage in the criminal conduct of possessing a firearm. Violation of her bail conditions by joining her husband and thereafter passively refusing to surrender to the pending warrant did not involve her possessing a firearm. Rather, the government's actions on June 7, 2007 warranted her believing that she had to defend herself from death or serious bodily injury by law enforcement and would support a jury instruction that thereafter she would have been justified in possessing firearms to defend herself in her own home.

After the events of June 7 Elaine Brown could have reasonably believed that she had no reasonable legal alternative to possessing firearms to defend herself from law enforcement. Disillusioned by her inability to mount the pro se defense which she reasonably, albeit erroneously, thought she and her husband had during the tax-related prosecution, during which some forty of the Browns' pro se motions and other requests for relief were denied, she had sufficient reason to believe that she could no longer receive fair redress from the government or the legal system.

There is an undeniable relationship between possession of firearms and defense of one's person and one's home from unlawful government force. See District of Columbia v. Heller, 128 S. Ct. 2783 (2008).

## CONCLUSION

For the above reasons Elaine Brown should be allowed to discuss the defense of justification in her opening and to offer evidence supporting that defense.

10

|  |  |
|---|---|
|  | Respectfully submitted,<br>ELAINE BROWN<br>By Her Attorney, |
| Date: June 25, 2009 | /s/ Bjorn Lange<br>Bjorn Lange (NHBA: 1426)<br>Assistant Federal Public Defender<br>Federal Defender Office<br>22 Bridge Street<br>Concord, NH 03301<br>Tel. 603-226-7360<br>Bjorn_Lange@fd.org |